The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Opinion and Award is modified with respect to the issue of average weekly wage.
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties in an executed Pre-Trial Agreement, as
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction over the parties and this claim. Furthermore, the parties are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff at all relevant times herein.
3. N.C. School Board Insurance Trust was the workers compensation carrier on risk at all relevant times herein.
4. Defendants first issued plaintiff a check for compensation on October 27, 1997, representing payment of temporary total disability benefits for the period beginning August 19, 1997, with an average weekly wage of $540.89 per week, covering a 10 week period. Thereafter, defendants paid plaintiff weekly temporary total disability benefits in the amount of $360.61 per week until September 28, 1998. Beginning September 29, 1998, defendants began to pay plaintiff temporary total disability benefits at the rate of $30.00 per week.
5. The issues to be determined are as follows per agreement of both parties to limit the issues as set out below:
a) What method should be used to calculate plaintiffs average weekly wage at the time of her injury by accident?
b) Are defendants entitled to a credit for overpayment of temporary total disability benefits, and if so, in what amount?
c) Should defendants be sanctioned or penalized for failure to file a Form 60, and if so, what sanction or penalty is appropriate?
d) Should defendants be sanctioned or penalized for failure to obtain approval of the Form 21 in this case until May 11, 1998, and if so, what sanctions or penalties are appropriate?
e) Should defendants be required to pay a 10% penalty for failure to timely pay temporary total disability benefits, pursuant to N.C.G.S.97-18(g)?
f) Can defendants reduce the amount of compensation being paid to plaintiff pursuant to an approved Form 21 without an Order from the Industrial Commission?
***********
The Pre-Trial Agreement along with its attachments and any additional stipulations are hereby incorporated by reference as though they were fully set out herein.
***********
The Full Commission adopts with modification the findings of fact found by the Deputy Commissioner and finds as follows
 FINDINGS OF FACT
1. Plaintiff was a thirty-six year old at the time of the hearing before the Deputy Commissioner. Prior to plaintiffs employment with defendant-employer, she worked primarily in childcare and performed some volunteer and paid work as an evangelist and pastor.
2. Defendant-employer first employed plaintiff in 1993 as a substitute teacher. She worked very little in 1993 and then worked more regularly beginning in 1994. As a substitute teacher, plaintiff worked as needed. Plaintiff was contacted by defendant-employer from a substitute teacher list which defendant-employer used when teachers were out for sickness or vacation. If plaintiff was not available to work when called, another person would be selected from the list. Substitute teaching was dependent on the availability of teachers and whether or not they were sick or on vacation. The need for substitute teachers fluctuated.
3. Plaintiff was paid $50.00 for a full day and $25.00 for a half day of work. Plaintiff mainly worked at the Elise Middle School but also worked at other schools in Moore County.
4. Plaintiff worked for defendant-employer only during the regular school year. A typical school year is ten months or forty-three weeks.
5. In the winter of 1995, plaintiff began to work as the basketball coach for the girls team. That season ran from approximately November 12, 1995 through February 16, 1996. Plaintiff normally worked in her coaching position for four days per week with Fridays off. While she worked as the girls coach she also continued to work as a substitute teacher.
6. In the spring of 1996, plaintiff was in school earning a criminal justice degree carrying a course load of 22 credit hours. Most of her classes were at night. Therefore, plaintiff was available to substitute teach during the day. Plaintiff gave her school schedule to defendant-employer so that they could work around her schedule. Plaintiff did not coach during the spring of 1996 and she did not substitute teach often. This was in part due to her educational endeavors and in part due to the fluctuating nature of substitute teaching.
7. Plaintiff had completed her degree by the beginning of the 1996-1997 school year and informed Mr. Charles Lambert, principal of Elise Middle School, that she would be available to do substitute teaching on a regular basis for the full school year. Plaintiff agreed to coach the girls basketball, volleyball and baseball teams for the 1996-97 school year. Mr. Lambert had indicated to her that she would be the top priority for the substitute teaching position for the full school year.
8. Plaintiff coached volleyball starting October 25, 1996. The basketball season began on November 5, 1996. While performing the duties of coach, plaintiff also performed substitute teaching on a regular basis.
9. Plaintiff was paid $250.00 for coaching basketball, $270.00 for volleyball and $295.00 for baseball during the 1995-1996 school year.
10. On December 2, 1996, plaintiff was injured while coaching girls basketball game when a student stepped on her ankle severely spraining it. Plaintiff continued to coach and perform the substitute teaching through December 18, 1996, after which she was not able to work due to her injury. Plaintiff has been diagnosed with reflex sympathetic dystrophy (RSD), which developed as a result of her injury. Plaintiff has not been released to return to work.
11. Following plaintiffs injury by accident while in the course and scope of her employment with defendant-employer, defendants paid plaintiffs medical benefits but did not begin payment of any weekly disability benefits until October 1997 pursuant to a Form 21 Agreement.
12. Defendants prepared a Form 21, admitting that plaintiff had sustained a compensable injury by accident and indicating an average weekly wage, which later was determined to be incorrect of $540.89 per week yielding a weekly compensation rate of $360.61. Significantly, on the Form 21 was printed language indicating that the average weekly wage was "subject to verification. The Form 21 also inaccurately reflected that plaintiffs disability began on May 19, 1997, rather than December 18, 1996 which is the actual date of disability. In addition benefits paid pursuant to this Form 21 were for the period beginning August 18, 1997.
13. When plaintiff received her first disability check, she contacted defendants concerned that the amount of her benefits was too high. However, defendants indicated to plaintiff that the amount of $360.61 for the weekly compensation rate was correct and continued to pay at that rate until September 28, 1998.
14. When defense counsel became involved in this matter, the inaccurate average weekly wage was discovered. Therefore, on September 29, 1998, defendants began to pay plaintiff at the rate of $30.00 per week. Defendants contend that there has been an overpayment in excess of $18,000 based on benefits paid at the rate of $360.61 during the period between August 19, 1997 and September 29, 1998 when those benefits should have been paid at the rate of $30.00 per week.
15. Prior to modifying plaintiffs compensation rate, Floyd Ellis, an adjuster with defendant-carrier, called Doris Lassiter, claims supervisor for defendant-carrier, and told her that the compensation rate was incorrect. Thereafter, Ms. Lassiter contacted Pat Benton, then Chief Claims Examiner of the Commission, to inquire regarding the procedure for modification of an incorrect compensation rate of compensation on a Form 21 bearing the language "subject to verification. Ms. Benton provided information to help determine the correct rate of compensation and the procedure for modification.
16. Thereafter, defendants sent plaintiff a letter indicating that the compensation rate was incorrect and that the rate should be $30.00 per week instead of $360.61. Defendants requested that plaintiff sign the letter agreeing to the wage modification. Plaintiff objected to the rate of $30.00 as incorrect and accordingly refused to sign or agree to the modification. Thereafter, defendants modified plaintiffs weekly compensation rate. Defendants have continued to pay plaintiff at the reduced compensation rate of $30.00 from September 29, 1998 through the date of the hearing before the Deputy Commissioner and continuing.
17. Plaintiffs W-2 Forms indicate that she earned $2,551.20 in 1995, $2,110.00 in 1996, and $335.00 in 1997. Although plaintiffs W-2 Form from 1996 shows earnings of $2,110.00, part of those earnings arose from work done in 1995. In fact, $150.00 paid in early 1996 was for work performed in 1995. Furthermore, earnings in the amount of $335.00 on the 1997 W-2 reflect work actually performed in 1996. Therefore, after adjusting the 1996 earnings accordingly, plaintiffs actual earnings due to work performed in 1996 is $2,295.00. Finally, after the reduction for $200.00 paid for spring 1996 teaching, the fall 1996 earnings for work are $2,095.00.
18. A log showing plaintiffs substitute teaching days reflects plaintiff worked 5 full days in the 1995-96 school year from November 16, 1995 through the end of the school year. It also reflects plaintiff worked 23 full days and 9 half days in the 1996-1997 school year between September 5, 1996 and December 6, 1996. This reflects a significant difference in amount of days plaintiff taught during the fall of 1996 as compared to earlier semesters.
19. Most of plaintiffs 1996 wages were earned in the fall of 1996, during which time plaintiff actually worked 15.14 weeks. An average weekly wage of $138.38 and a weekly compensation rate of $92.25 are obtained based only on the fall 1996 earnings of $2,095.00 divided by the time plaintiff actually worked or 15.14 weeks. However, this method is not fair to defendants based on the circumstances surrounding plaintiffs employment including the fact that substitute teaching fluctuates and that plaintiff was available during the day in the spring semester to teach even though she was a student herself.
20. Using plaintiffs 1996 earnings, spring and fall combined, in the amount of $2,295.00 and the entire forty-three week school year, plaintiffs average weekly wage is $53.37 yielding a weekly compensation rate of $35.58. If plaintiffs earnings in 1996 are only considered through the date of the accident or December 2, 1996, the average weekly wage is $49.07 yielding a weekly compensation rate of $32.71. These methods are unfair to plaintiff in that they do not consider the fact that plaintiffs own educational requirements interfered with the spring 1996 coaching and substitute teaching nor do they consider her changed circumstances in the fall of 1996. Plaintiff was no longer a student in the fall of 1996 making her available to substitute teach more often and allowing her to accept additional coaching jobs that fall.
21. Under the circumstances of this case, the usual methods of calculating the average weekly wage and the resulting compensation rate are unfair to both parties. The above methods of calculation each represent in part the average weekly wage of plaintiff. In order to fairly calculate the average weekly wage, a combination of these methods must be taken into consideration. It is clear that while the substitute teaching position has fluctuating hours and consequently fluctuating salary, it is clear that plaintiffs own class schedule impacted her availability to substitute teach. Therefore, an average weekly wage of $124.96 yielding a weekly compensation rate of $62.48 is fair to both parties under the circumstances. This average weekly wage is determined by the average of $138.38 (and its corresponding compensation rate of $92.25 as referenced in Finding of Fact #19) and $49.07 (and its corresponding weekly compensation rate of $32.71 as referenced in Finding of Fact #20). This method takes into consideration all of the inferences which may be made from the evidence of record including the unusual circumstances of this case.
22. Plaintiff has not been compensated by defendants for the time period from December 18, 1996 until August 19, 1997. However, defendants have overcompensated plaintiff during the period of August 19, 1997 until September 29, 1998 in the amount of approximately $16,099.02 based on a compensation rate of $62.48 as found herein to be fair. Based on the average weekly wage and corresponding compensation rate found herein, plaintiff has not been fully compensated by defendants for the period beginning September 29, 1998 and continuing. Nevertheless, considering all time periods and the total amount paid, plaintiff has received an overpayment.
23. Due to the complicated nature of the issues of fact and law, defendants actions and defense have been reasonable under the unusual circumstances of this case.
24. Plaintiff has not reached maximum medical improvement and has not yet received a permanent partial disability rating.
25. Although plaintiff has had the benefit of the overpayments made by defendants, she was aware of the inaccuracy of the average weekly wage and the Form 21 indicated on its face that the average weekly wage was "subject to verification. Plaintiff did not reasonably rely to her detriment on the inaccurate average weekly wage and corresponding compensation rate, which were "subject to verification on the face of the Form 21 Agreement.
26. Temporary total disability paid to plaintiff in the amount of $360.61 for the period of August 19, 1997 until September 29, 1998 was in excess of the amount actually owed by plaintiff and was therefore not due and payable.
***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer on December 2, 1996, which resulted in her incapacity to earn wages beginning on December 18, 1996. N.C.G.S. 97-2(6).
2. The usual methods of calculating the average weekly wage are unfair to both parties under the circumstances of this case. Because of exceptional reasons and circumstances and unfairness to the parties the method which most nearly approximates the amount which the plaintiff would be earning were it not for the December 2, 1996 injury results in an average weekly wage of $124.96 yielding a weekly compensation rate of $62.48 which is fair to both parties under the circumstances. N.C.G.S.97-2(5).
3. Although there was an error in the computation of the average weekly wage on the Form 21, the Form 21 stat this amount is "subject to verification. Therefore, it is not necessary that to attempt to overturn the Form 21 to modify the average weekly wage based on allegations of fraud, misrepresentation, or undue influence. Furthermore, this case is distinguishable from the Swain case in which the Form 21 in question did not bear the language "subject to modification. Swain v. C N EvansTrucking Co., 126 N.C. App. 332, 434 S.E.2d 845 (1997); I.C. Form 21,revised March 1995.
4. Defendants are entitled to modify the Form 21 to reflect that plaintiffs average weekly wage is $124.96 per week, yielding a compensation rate of $62.48 per week. Id.
5. Subject to a reasonable attorneys fee, plaintiff is entitled to receive temporary total disability benefits from December 18, 1996 and continuing until she has returned to work at the same or greater wages or until further order of the Commission. Plaintiff has received no temporary total disability benefits for the period of December 18, 1996 through August 18, 1997 and is therefore entitled to receive benefits at the weekly compensation rate of $62.48. Since plaintiff has already received benefits for the period of August 19, 1997 through September 28, 1998 at an incorrect rate of $360.61 resulting in an overpayment, plaintiff is not entitled to further benefits for this time period. Plaintiff received benefits at the inaccurate rate of $30.00 beginning September 29, 1998. Although a rate of $62.48 has now been established, plaintiff is not entitled to benefits for this period in order that defendants recoup a portion of the overpayment. Nevertheless, consequently, as of the date of this Award, plaintiff is entitled to temporary total disability benefits at the rate of $62.48 and continuing until she returns to work at the same or greater wage or until further order of the Commission. N.C.G.S. 97-29.
6. Plaintiff is not entitled to attorneys fees to be assessed against defendants as this case was defended on reasonable grounds and defendants actions have been reasonable under the circumstances of the facts and the law. N.C.G.S. 97-88.1.
7. Subject to the limitations of N.C.G.S. 97-25.1, plaintiff is entitled to reasonably necessary medical treatment related to her compensable injury by accident, which tends to effect a cure, provide relief or lessen the period of disability. N.C.G.S. 97-25.1 and 97-25.
8. Defendants are not estopped from receiving a credit for the overpayment due to the miscalculation of the average weekly wage. Although plaintiffs entitlement to temporary total disability benefits outlined above allows defendants to recoup a portion of the past overpayment, defendants are nevertheless entitled to a credit in the future for the remainder of the overpayment to be deducted from plaintiffs permanent partial disability benefits, when and if she is entitled to them. At this time plaintiff has not reached maximum medical improvement. N.C.G.S. 97-42 and 97-31.
***********
Considering the foregoing findings of fact and conclusions of law, the undersigned makes the following
 AWARD
1. Subject to attorneys fees hereinafter awarded, defendants shall pay to plaintiff temporary total disability benefits for the period of December 18, 1996 through August 18, 1997 at a weekly compensation rate of $62.48. Plaintiff has already received benefits for the period of August 19, 1997 through September 28, 1998 at an incorrect rate of $360.61 resulting in an overpayment. Therefore, defendants are not ordered to pay further benefits for this time period. Furthermore, although plaintiff received benefits at the inaccurate rate of $30.00 beginning September 29, 1998, defendants are not ordered to pay benefits for this period in order that a portion of the overpayment be recouped. As a rate of $62.48 has now been determined to be accurate, defendants shall pay as of the date of this Award, subject to an attorneys fee approved herein, temporary total disability benefits to plaintiff at the rate of $62.48 and continuing until plaintiff returns to work at the same or greater wage or until further order of the Commission.
2. Defendants shall pay for all reasonably necessary medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury when bills for same have been submitted to and approved by the Industrial Commission, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiffs period of disability, subject to the limitations of N.C.G.S. 97-25.1.
4. An attorneys fee of twenty-five percent (25%) of the compensation due plaintiff herein is hereby awarded to plaintiffs counsel and shall be paid as a part of the cost of this action, with payments being made directly to plaintiffs counsel.
5. Defendants shall pay the costs of this action due the Commission.
This the ___ day of November 2000.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_______________ CHRISTOPHER SCOTT COMMISSIONER
S/_____________ THOMAS J. BOLCH COMMISSIONER